# IN THE UNITED STATES JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

|  |  |  |
|---|---|---|
| IN RE:  AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION | ) ) ) ) ) ) ) ) ) ) ) | MDL Docket No. 2873  This Document Relates To:  *Ridgewood Water v. 3M Company, et al., No. 19-cv-09651* (D.N.J.) |

## MEMORANDUM OF LAW IN SUPPORT OF RIDGEWOOD WATER'S MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO – 10)

Matthew K. Edling
**SHER EDLING LLP**
100 Montgomery St., Suite 1410
San Francisco, CA 94104
Tel: (628) 231-2500
Fax: (628) 231-2929
matt@sheredling.com

Matthew S. Rogers Esq.
**LAW OFFICES OF MATTHEW S. ROGERS, ESQ., LLC**
123 Prospect Street
Ridgewood, New Jersey 07450
Tel: (201) 854-3700
Fax: (201) 857-3699
msr@mrogerslaw.com

*Attorneys for Plaintiff Ridgewood Water*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................... 1

FACTUAL BACKGROUND .............................................................................. 3

PROCEDURAL OVERVIEW ............................................................................ 5

ARGUMENT .................................................................................................... 6

    A.    Federal Jurisdiction Does Not Exist, and Plaintiff's Remand Motion Should Be Decided before this Motion is Decided. ..................................................... 6

        1.    Removal Standard ........................................................................ 6

        2.    Defendants Were Not Acting Under a Federal Officer When They Manufactured and Sold the AFFF and Other PFOA and PFOS That Injured Ridgewood. ...................................................................... 7

        3.    There Is No Causal Nexus Between Defendants' Manufacture and Sale of MilSpec AFFF and Ridgewood's Injuries. ................................. 12

        4.    Defendants Do Not Have a Colorable Federal Contractor Defense............. 15

    B.    Because the Action Does Not Involve Federally-Regulated Use of MilSpec AFFF — the Principal Issue in the MDL — Transfer Is Improper. ........................ 17

    C.    Ridgewood's Claims Focus Overwhelmingly on Contamination from Non-AFFF Release Sites. ......................................................................... 19

    CONCLUSION .............................................................................................. 20

## TABLE OF AUTHORITIES

**Cases**

*Ayo v. 3M Company*,
  Case No. 18-cv-0373(JS)(AYS), 2018 WL 4781145 (Sept. 30, 2018) ................... 11, 12, 16, 17

*Bailey v. Monsanto Co.*,
  176 F. Supp. 3d 853 (E.D. Mo. 2016) ................................................................... 17

*Baran v. ASRC Fed. Mission Sols.*,
  No. CV 17-7425(RMB/JS), 2018 WL 3054677 (D.N.J. June 20, 2018) ................................ 7

*Boyle v. United Techs. Corp.*,
  487 U.S. 500 (1988) ......................................................................................... 16

*Creative Home Accents, LLC v. Fifth Third Bancrop (In re Checkin Account Overdraft Litig.)*,
  818 F. Supp. 2d 1373 (J.P.M.L. 2011) ................................................................ 18

*Davis v. Wells Fargo*,
  824 F.3d 333 (3d Cir. 2016) .............................................................................. 15

*Fidelitad, Inc. v. Insitu, Inc.*,
  904 F.3d 1095 (9th Cir. 2018) ....................................................................... 8, 9, 10

*Hagen v. Benjamin Foster Co.*,
  739 F. Supp. 2d 770 (E.D. Pa. 2010) ................................................................... 16

*In re Abbot Laboratories, Inc.*,
  763 F. Supp. 2d 1376 (J.P.M.L. 2011) ................................................................ 18

*In re Commonwealth's Motion to Appoint Counsel Against or Directed to Def. Ass'n of
  Philadelphia*,
  790 F.3d 457 (3d Cir. 2015), as amended ....................................................... 12, 15

*In re Credit Union Checking Account Overdraft Litig.*,
  158 F. Supp. 3d 1363 (J.P.M.L. 2016) ................................................................ 18

*Kelly v. Monsanto Co.*,
  No. 4:15 CV 1825 JMB, 2016 WL 3543050 (E.D. Mo. June 29, 2016) ......................... 14, 15

*Leite v. Crane Co.*,
  749 F.3d 1117 (9th Cir. 2014) ............................................................................ 7

*Papp v. Fore-Kast Sales Co.*,
  842 F.3d 805 (3d Cir. 2016) ....................................................................... 6, 7, 12, 15

*Vedros v. Northrop Grumman Shipbuilding, Inc.*,
  No. CIV.A. 2:11-67281-ER, 2012 WL 3155180 (E.D. Pa. Aug. 2, 2012) .......................... 16

*Watson v. Philip Morris Companies, Inc.*,
  551 U.S. 142 (2007) ...................................................................................... 7, 8, 9

**Statutes**

28 U.S.C. § 1442 ........................................................................................... passim

28 U.S.C. § 1442(a)(1) ....................................................................................... 12

Plaintiff Ridgewood Water ("Ridgewood"), through its undersigned counsel, respectfully submits this memorandum of law in support of its Motion to Vacate the Conditional Transfer Order (CTO-10) [MDL Dkt. No. 404] ("CTO") in *Ridgewood Water v. 3M Company, et al.*, Civil Action No. 19-cv-09651 (D.N.J.) (the "Action"), because the Action has nothing to do with the MDL, and transfer would be jurisdictionally improper, would prejudice Ridgewood, and would not serve the interests of the MDL. This motion is based on the facts and the reasons set forth below and the Exhibits submitted with this motion.

## PRELIMINARY STATEMENT

On December 7, 2018, the Panel issued its initial Transfer Order [MDL Dkt. No. 239] (the "Transfer Order") which created a multidistrict litigation ("MDL") for various cases regarding subsurface contamination from aqueous film-forming foam ("AFFF"). The MDL is currently pending in the District of South Carolina (the "Transferee Court").

Ridgewood filed the Action in the Superior Court of New Jersey to recover the costs of removing toxic perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonic acid ("PFOS") (collectively, "PFAS") from its public drinking water supply wells. *See generally* Complaint (Exhibit A). Ridgewood's complaint focuses almost exclusively on PFAS releases from industrial facilities and sites where consumer products containing PFAS are disposed and alleges no connection to – or injury from – Military Specification ("MilSpec") AFFF. Indeed, Ridgewood has expressly disclaimed such injuries. Ex. A ¶ 69. Nonetheless, Defendants have attempted to remove and transfer the Action to the Transferee Court simply because one possible source of PFOA and PFOS contamination is the manufacture and use of AFFF. Defendants' removal and attempted transfer were improper. Three considerations drive this point home.

First, this Action is not a federal case, and the Transferee Court will not have jurisdiction over it.  Defendants' sole basis for grasping at federal jurisdiction is their allegation that MilSpec AFFF used at a single, federally-regulated airport could have contaminated Ridgewood's water supply. This assertion is patently false, and Ridgewood has provided factual evidence vitiating this contention. *See generally* Motion to Remand (Ex. C) and Declaration of David Terry (Ex. C-1). Moreover, Ridgewood's remand motion is set to be decided by the District of New Jersey before the briefing on the instant motion is complete. Therefore, any potential transfer of the Action would be mooted by its return to New Jersey state court.

Second, Ridgewood's Action does not at all concern federally-regulated use of MilSpec AFFF — *the only* product at issue in the MDL.  In fact, Ridgewood has disclaimed any injuries caused by federally-regulated use of MilSpec AFFF.  Thus, Ridgewood's claims do not share the core issue of the MDL.

Third, Ridgewood's claims are factually distinct from those in the MDL and should be categorized consistent with the Panel's previous recognition that "non-AFFF cases" do not belong in the MDL. The Action is best characterized as a "non-AFFF" case because the primary sources of Ridgewood's PFOS and PFOA contamination are industrial operations that used PFAS and disposed of them in their waste streams, and sites where consumer products containing PFAS were disposed. Indeed, the Panel has already declined to transfer cases like Ridgewood's because they "include far more site-specific issues" and "different modes of contamination." Ex. D (Transfer Order) at p. 6. The Panel further found that inclusion of cases like Ridgewood's in the MDL "could quickly become unwieldy." *Id.* Here, the same conclusion must be reached because of the distinct sources of contamination.

The transfer of Ridgewood's case would be jurisdictionally improper, would prejudice Ridgewood, and would not serve the interests of the MDL. Accordingly, Ridgewood respectfully requests the Panel vacate CTO-10 as it pertains to the *Ridgewood* Action.

## FACTUAL BACKGROUND

Ridgewood supplies drinking water to more than 60,000 customers in four municipalities in Bergen County, New Jersey. Ex. A (Complaint) ¶ 7. The vast majority of Ridgewood's 52 wells are contaminated with PFOA and PFOS, including at levels that in some cases exceed proposed maximum contaminant levels ("MCL") adopted by the New Jersey Department of Environmental Protection. *See id.* at ¶¶ 8, 9, 29. Ridgewood obtains a portion of the water it serves through interconnections with neighboring water utilities, including Suez Water New Jersey and Hawthorne Water Department. *Id.* at ¶ 8.

PFOA and PFOS are among the most toxic of a family of manmade chemicals known as perflourinated compounds. *Id.* at ¶ 23. These chemicals, and specifically PFOA and PFOS, are associated with a variety of industrial processes and products, including Teflon and other fluoropolymers, Scotchguard, medical devices, carpet coatings, architectural resins, waterproof fabrics, cooking utensils, industrial de-misters, welding equipment, coated fiberglass, wax removers, floor polish, defoamers, wetting agents, AFFF, and many others. They enter the environment at every stage of their manufacture, use, and disposal. *Id.* at ¶ 28.  The following diagrams illustrate some sources of PFOA and PFOS contamination in groundwater, notably the myriad sources of contamination that are distinct from AFFF manufacture and use.

3

*Figure 1: Major Sources of PFOA Contamination:* [1]



*Figure 2: Major Sources of PFAS Contamination*[2,3]



[1] *See generally* Prevedouros, et al., *Sources, Fate and Transport of Perfluorocarboxylates*, ENVTL. SCI. & TECH. 40 (2006).

[2] *See generally id.*

[3] "POSF," as distinct from "PFOS" refers to perfluorooctanesulfonyl fluoride, a precursor to PFOS. Chemicals made from POSF can degrade to PFOS in the environment.

PFOA and PFOS releases that contaminated Ridgewood's wells occurred at various diffuse point sources, such as industrial and manufacturing facilities and businesses; sites where locations where PFAS-contaminated water is used for irrigation; and sites where consumer products are disposed. Ex. A ¶ at 71. These releases occurred near and contaminated the source waters from which Ridgewood obtains its drinking water supply and have contributed to contamination in Ridgewood's wells. *Id.* at ¶¶ 64–67, 71. Additional potential sources of the contamination are locations where commercial AFFF was stored or used, but that is not the focus of Ridgewood's claims, nor the anticipated primary source of the contamination.  *See id.* at ¶¶ 64–67, 71.

To the extent AFFF may have contributed to Ridgewood's injuries, it is limited to *commercial* AFFF use by non-federal consumers at fire readiness and suppression sites in northern Bergen County, New Jersey. *Id.* at ¶¶ 66–67. These sites are located upstream and upgradient of Ridgewood, with a clear and direct pathway for contaminants to migrate to Ridgewood's wells; or near enough that PFOA and PFOS releases would have directly impacted those wells. *See id.* at ¶ 67 (citing locations within Ridgewood, in Mahwah, and along Ho-Ho-Kus Brook); *see also* Ex. C-1 (Terry Decl.) at ¶¶ 16-17. These non-federal sites did not require, and were under no directive to obtain or use, MilSpec AFFF. Ex. A at ¶ 41. And importantly, Ridgewood has *expressly disclaimed* any injury to its wells from AFFF that was used at any federally-regulated or military site. Ex. A at ¶ 69 (no such sources contributed to Ridgewood's injuries); *see also supra,* Preliminary Statement; Ex. C *generally*.

## PROCEDURAL OVERVIEW

On February 25, 2019, Ridgewood filed its complaint in the Superior Court of New Jersey, Bergen County. Defendant wrongly removed the Action to the District of New Jersey on April 11, 2019. On April 17, 2019, the Court entered Notice of CTO-10, conditionally transferring the

Action to the Transferee Court and allowing for opposition thereto.  Ridgewood filed its Notice of

Opposition to CTO-10 on April 24, 2019.  The next day, Ridgewood filed its Motion to Remand

to New Jersey State Court. The Motion to Remand is set for New Jersey District Court's motion

day on June 3, 2019. Dkts. No. 5, 8. Ridgewood's reply in support of the instant Motion to Vacate

CTO-10 is due June 5, 2019 (Dkt. No. 415), and presumably, the Panel will hear and decide the

matter thereafter.

## ARGUMENT

**A.     Federal Jurisdiction Does Not Exist, and Plaintiff's Remand Motion Should Be Decided before this Motion is Decided.**

The sole basis for potential transfer of the Ridgewood Action to the MDL is Defendants'

improper removal to federal court.  Their removal is singularly based on the applicability of a non-

existent federal contractor defense, which, in turn, rests entirely on Defendants' factually false

contention that *one* federally-regulated airport eight miles away from Ridgewood *may* have used

MilSpec AFFF. This assertion was easily rebuffed in Ridgewood's Motion to Remand (Ex. C) and

supporting declaration (Ex. C-1), making clear that by the time this Motion to Vacate is heard, the

Action is likely already to be back in New Jersey State Court, rendering transfer to the MDL moot.

   *1.     Removal Standard*

For removal to be proper under § 1442(a)(1) a defendant must meet four requirements: "(1)

[the defendant] is a 'person' within the meaning of the statute; (2) the [plaintiff's] claims are based

upon the [defendant's] conduct 'acting under' the United States, its agencies, or its officers; (3)

the [plaintiff's] claims against [the defendant] are 'for, or relating to' an act under color of federal

office; and (4) [the defendant] raises a colorable federal defense to the [plaintiff's] claims." *Papp

v. Fore-Kast Sales Co.*, 842 F.3d 805 (3d Cir. 2016) at 812. The removing party "may not offer

mere legal conclusions," but "must allege the underlying facts supporting each of the requirements

for removal jurisdiction." *Leite v. Crane Co.*, 749 F.3d 1117, 1122 (9th Cir. 2014) (cited with approval in *Papp*, 842 F.3d at 811).

Because Ridgewood's injuries did not arise from federally-mandated MilSpec AFFF, the only product that Defendants could arguably claim were manufactured "acting under" an officer of the United States, none of Ridgewood's claims relate to any act taken by any defendant under color of federal office. And because the alleged tortious conduct did not arise from or relate to any federal contract for MilSpec AFFF—the only federal contracts on which Defendants rely— Defendants cannot present a colorable government contractor defense justifying removal.

      2.     *Defendants Were Not Acting Under a Federal Officer When They Manufactured and Sold the AFFF and Other PFOA and PFOS That Injured Ridgewood.*

Private defendant removal can only occur under 28 U.S.C. § 1442 when a defendant was "acting under" an officer of the United States. The words "acting under" are construed liberally, but the Supreme Court has cautioned that the statute's "broad language is not limitless." *Watson v. Philip Morris Companies, Inc.*, 551 U.S. 142, 147 (2007). In particular, "where a private actor seeks the benefit of the federal officer removal statute, there must be some relationship between the government and the private actor beyond that of 'regulator/regulated.'" *Baran v. ASRC Fed. Mission Sols.*, No. CV 17-7425(RMB/JS), 2018 WL 3054677, at *5 (D.N.J. June 20, 2018). "[P]recedent and statutory purpose make clear that the private person's 'acting under' must involve an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior." *Watson*, 551 U.S. at 152 (emphasis in original).

In their Notice of Removal, Defendants have alleged that they were and are acting under federal direction and control by "designing, manufacturing, and supplying the MilSpec AFFF products at issue, . . . in accordance with detailed specifications, promulgated by Naval Sea Systems Command, that govern AFFF formulation, performance, testing, storage, inspection, and

labeling." Ex. B at ¶ 27. But that argument misreads and misconstrues Ridgewood's complaint. Principally, Ridgewood has expressly disclaimed injuries from federally-regulated use of MilSpec AFFF. Ex. A at ¶¶ 68–69; *see also supra* at Preliminary Statement. Instead, Ridgewood alleges that its injuries arise from industrial facilities where *non*-AFFF products containing PFOA and PFOS were used, *see id.* at ¶ 65, from disposal of a myriad of industrial and consumer products, and from fire suppression and fire-fighting training activities that were *not* subject to the regulations Defendants cite requiring the use of MilSpec AFFF, *see id.* at ¶¶ 66–67. Defendants' design, manufacture, and sale of non-AFFF products and AFFF to non-federal consumers did not "involve an effort to *assist*, or help *carry out*, the duties or tasks for a federal superior," and Defendants do not (and cannot) argue otherwise. *See Watson*, 551 U.S. at 152.

*Fidelitad, Inc. v. Insitu, Inc.*, 904 F.3d 1095, 1100 (9th Cir. 2018), is instructive. There, the removing defendant designed and manufactured "unmanned aerial systems—commonly known as 'drones'—that it s[old] to military and civilian customers." *Id.* at 1097. The plaintiff, a "reseller of [the defendant's] drones in Latin America," sued the defendant alleging the manufacturer breached contracts associated with drone sales in Colombia. *Id.* The seller plaintiff "made several sales of [the manufacturer defendant's] drones to the Colombian Air Force and the United States Military in Colombia (for end use by the Colombian military)." *Id.* at 1098. The manufacturer, of its own volition, delayed fulfilling the orders and asked the seller to clarify and perfect export licenses the seller was required to obtain from the United States. The defendant ultimately filled some orders by allowing the "United States [to] take title to the drones in this country and export them to Colombia itself, making the export licenses unnecessary." *Id.* After filling those orders, the manufacturer refused to do further business with the seller and began making direct sales to some of the seller's Colombian customers. *Id.* The seller sued in Washington state court alleging breach

of an oral distributorship agreement, and breach of the sales contracts for the drones destined for the Colombian Air Force. *Id.* The manufacturing defendant removed, asserting federal officer jurisdiction under 28 U.S.C. § 1442. *Id.* at 1097–98.

The manufacturer defendant argued in relevant part that it was "acting under" a federal officer when it delayed fulfilling the plaintiff's purchases because it was "attempting to enforce specific provisions in [plaintiff's federally mandated] export licenses," and because some of the products were exported to Colombia while the U.S. government held title to them and were ultimately purchased by the U.S. government for sale to the Colombian air force. *Id.* at 1100–01. The Ninth Circuit rejected both arguments, holding that "the government did not contract with [the defendant] for the equipment at issue," but rather *the plaintiff* purchased them directly from defendant. *Id.* at 1100–01. The defendant had therefore not "acted pursuant to a directive in any federal contract," and the "export licenses d[id] not 'establish the type of formal delegation that might authorize [the defendant] to remove the case.'" *Id.* at 1101 (quoting *Watson*, 551 U.S. at 156). It made no difference that the defendant also manufactured and sold similar drones directly to the United States. *See id.* at 1101 n. 3. The manufacturer defendant could only take advantage of the federal officer removal statute had it been "'helping the Government to produce an item that it needs' pursuant to a federal contract." *Id.* (quoting *Watson*, 551 U.S. at 153). Because the manufacturer defendant "did not act pursuant to a contract with the federal government" in its conduct toward the seller plaintiff, removal was improper. *Id.*

The facts in Ridgewood's case are closely analogous to those in *Fidelitad*. Defendants manufacture AFFF that it sells to both government and civilian customers, and which are subject to specifications *when it is purchased by the government* or for use at certain federally-regulated airports or military facilities. These specifications have no bearing on Defendants' sales to

9

purchasers other than the government. Just as in *Fidelitad*, Ridgewood's injuries here do not stem from directives in any federal contract between it and any Defendant, or any instruction to a Defendant from a federal superior. Ridgewood has alleged injuries from PFOA- and PFOS-laden products *excluding* federally-mandated MilSpec AFFF, has specifically disclaimed injuries attributable to MilSpec AFFF released at federal or federally regulated facilities, and has presented evidence rebutting Defendants' unfounded assertions that PFOA and PFOS reached its water system from sources required to use MilSpec AFFF. *See* Part I.B, *infra*.

To the extent Defendants used PFOA and PFOS in formulating commercial AFFF and other products, and then sold those products to customers who are *not required* to purchase AFFF that meets MilSpec standards (e.g., the Ridgewood Fire Department), "[n]o federal officer directed" the formulation or sales of that AFFF. *See Fidelitad*, 904 F.3d at 1099. Similarly, the only purported federal contracts Defendants reference are those ostensibly governing sales of MilSpec AFFF to entities mandated under federal regulations to purchase products appearing on the DOD Qualified Products Listing. But Ridgewood's injuries, to the extent they were caused by AFFF among the myriad other sources of PFAS, are attributable to AFFF provided to entities or individuals under no such mandate.[4] Ex. A ¶¶ 67–69. There was no government contract between Defendants and PFOA/PFOS releasors here. Thus, as in *Fidelitad*, "the government did not contract with [Defendants] for the equipment at issue," and the third-party users of PFOA- and PFOS-laden products "ordered the [products] directly from [Defendants]," without any subjection, guidance, or control from the federal government. *See* 904 F.3d at 1101.

---

[4] As discussed below, PFOA/PFOS contamination from non-MilSpec AFFF is not the primary focus of Ridgewood's allegations, whereas factual and legal issues surrounding MilSpec AFFF are the center of the MDL.

The recent decision in *Ayo v. 3M Company*, Case No. 18-cv-0373(JS)(AYS), 2018 WL 4781145 (Sept. 30, 2018), further illustrates Ridgewood's point. The *Ayo* plaintiffs alleged in New York state court exposure to PFOA and PFOS and specifically that "for decades the [New York Air National Guard ha[d]] used a half-acre Airport Fire Training Area located at the Airport" where it applied MilSpec AFFF, and that the manufacturer defendants had "failed to warn the U.S. Department of Defense ('DoD'), the U.S. Air Force, Gabreski, municipal water suppliers, and residents of the Communities of the dangers posed by their AFFF products." *Id.* The defendants removed under 28 U.S.C. § 1442, on the same bases as Defendants here. *Id.* at *6. Critically, the *Ayo* plaintiffs *expressly alleged that they were injured by MilSpec AFFF sold to and used by the United States military at a facility leased to the United States military*.[5] On those facts, the court found that the defendants arguably (for purposes of removal) were acting under federal superiors insofar as they "help[ed] the government develop a product at the government's request," and "[t]hrough contracts with the government, . . . formulated, produced, and supplied these essential AFFF products *to the military*." *Id.* at *8–9 (emphasis added). Here, Ridgewood does not allege any injury traceable to a product supplied to the military, or manufactured or sold at the government's request. This is contrary to various cases in the MDL, who do allege injury from Milspec AFFF.  And unlike in *Ayo*, where the plaintiffs had to confront a clear case of government involvement in the PFOA and PFOS releases, Defendants in the *Ridgewood* Action simply do not have a factual basis to assert they "acted under" a federal officer.

Put simply: Defendants arguably may have been acting under federal subjection and control when they manufactured and sold MilSpec AFFF that contained PFOA and PFOS *to*

---

[5] *See, e.g.*, *id.* at *9 (quoting the plaintiffs' allegation "that Manufacturing Defendants 'regularly contract with . . . the DOD, the [U.S. Air Force], specific installations, and/or third-party logistic intermediaries, to sell and deliver AFFF to bases throughout the country, including to Gabreski'").

*federal entities or federally-regulated airports*, as in *Ayo*. But no federal officer directed Defendants to incorporate PFOA or PFOS into products supplied to non-federal consumers, and those other products are the sources of Ridgewood's injuries. As such, Defendants cannot satisfy section 1442's "acting under" element, and remand should occur on this basis alone.

> 3. <u>There Is No Causal Nexus Between Defendants' Manufacture and Sale of MilSpec AFFF and Ridgewood's Injuries.</u>

Proper removal also requires that alleged conduct was undertaken 'for or relating to' a federal office." *Papp*, 842 F.3d at 813; 28 U.S.C. § 1442(a)(1). A defendant must show "a 'connection' or 'association' between the act in question and the federal office." *In re Commonwealth's Motion to Appoint Counsel Against or Directed to Def. Ass'n of Philadelphia*, 790 F.3d 457, 471 (3d Cir. 2015), *as amended* (June 16, 2015) ("*Def. Ass'n of Philadelphia*").

Defendants cannot satisfy this element for two reasons. First, as discussed above, Ridgewood has disavowed any connection between its injuries and Defendants' designing, manufacturing, and supplying MilSpec AFFF to the federal government or any entity subject to a federal regulation requiring it to use MilSpec AFFF. The injurious conduct actually alleged—Defendants' design, manufacture, and sale of PFOA and PFOS products, including commercial AFFF to non-federal users—has no "'connection' or 'association'" to any "federal office." *See Def. Ass'n of Philadelphia*, 790 F.3d at 471.[6]

Second, even absent Ridgewood's exclusion of federally-mandated MilSpec AFFF from its alleged injuries, the allegations by Defendants attempting to tie Ridgewood's PFOA and PFOA

---

[6] The *Ayo* case is again distinguishable. That court found the causal connection element satisfied because "[c]rediting Manufacturing Defendants' theory of the case, the use of [PFAS] 'occurred *because of* what they were asked to do by the Government'—to design and manufacture Mil-Spec AFFF products . . . ." *Ayo*, 2018 WL 4781145 at *9. Here, Ridgewood's injuries were not caused by any federally-mandated MilSpec AFFF products, and as such do not arise from anything Defendants "were asked to do by the Government."

contamination to MilSpec sources do not withstand even the slightest scrutiny. Defendants allege *only on information and belief* that MilSpec AFFF was used at Teterboro, that "the flow of groundwater in that area of New Jersey is generally in the direction running from the airport to" Oradell Reservoir and other collection sources for Suez Water, and that therefore Teterboro "is a source of the alleged PFOA and/or PFOS contamination that gives rise to Plaintiff's claims." Ex. B ¶¶ 17–22. Those allegations are demonstrably false.

As explained in the declaration of hydrogeologist David Terry (Ex. C-1), groundwater in the Teterboro area does not flow toward Oradell Reservoir, which sits eight miles north-northwest of the airport. Ex. C-1 ¶¶ 14–19. Instead, the groundwater beneath Ridgewood, Oradell Reservoir, and Teterboro generally flows south toward the southerly flowing Berry's Creek, a tributary to the Hackensack River, which in turn flows south into Newark Bay. *Id.* at ¶¶ 17–19. Because "[g]roundwater contaminants that enter subsurface aquifers generally move with the prevailing groundwater flow direction," any PFOA and PFOS released at Teterboro due to MilSpec AFFF use would flow "toward the Hackensack River and ultimately to Newark Bay—away from Oradell Reservoir" and *away* from Ridgewood. Ex. C-1 ¶¶ 18–20. Mr. Terry concludes: "As such, subsurface transmission of PFOA and PFOS to Ridgewood either directly or via Oradell Reservoir is not a viable mechanism to account for the contamination in Ridgewood's wells." *Id.* at ¶ 21.

Water imported to Ridgewood via water redistribution systems also cannot support Defendants' allegations that Teterboro is a source of Ridgewood's PFOS and PFOA contamination. For one thing, there are no public drinking water supply wells near Teterboro Airport that contribute to the water redistribution network, because the groundwater there is too saline and too impacted by historic pollution to be potable; and the nearest public drinking water supply wells are all north of—and upgradient from—the Airport. Ex. C-1 ¶¶ 22–24. "Because

there are no wells pumping groundwater from areas of the aquifer impacted by Teterboro Airport PFOA and PFOS releases, there is no possibility that PFOA and PFOS in Oradell Reservoir originated from groundwater extraction at or near Teterboro Airport." *Id.* at ¶ 24.

Moreover, while Suez Water gathers some of its drinking water from surface intakes on the Hackensack River system, all of those intakes are *upriver and upgradient* from Teterboro and thus cannot be "affected by PFOA or PFOS emanating from Teterboro Airport." *Id.* at ¶ 25. For that reason, "PFOA and PFOS emanating from Teterboro Airport therefore does not enter Suez Water's redistribution infrastructure via surface water intakes," *id.* at ¶ 26, and have not been imported to or caused contamination in Ridgewood's wells.

The court rejected federal officer removal and granted remand on analogous facts in *Kelly v. Monsanto Co.,* No. 4:15 CV 1825 JMB, 2016 WL 3543050, at *9 (E.D. Mo. June 29, 2016). There, a predecessor to the defendants manufactured polychlorinated biphenyls ("PCBs"), which it sold "to numerous industrial customers, for a wide variety of industrial uses." *Id.* at *1–2. The plaintiffs sued in state court alleging that PCBs had broadly contaminated air, water, soil, and the food chain, but "'affirmatively disclaim[ed]' any damages or actions arising out of an act of the United States or of any federal officer." *Id.* at *2. The defendants removed under § 1442. *Id.* at *1. The court observed that the evidence before it showed that "although the government required the use of PCBs in certain products and provided financial assistance to Old Monsanto to manufacture PCBs during World War II, Old Monsanto sold the PCBs mostly to government contractors and not to the government itself." *Id.* at *9. Because the proportion of PCB sales to the federal government "would account for less than one one-thousandth of one percent of overall sales of PCBs," the court found those sales too insubstantial for § 1442's causal connection requirement:

> [T]he amount of sales of PCBs manufactured by Old Monsanto for open uses
> pursuant to contracts with the government and sold to federal contractors at

14

the direction of the government relative to the amount of PCBs allegedly persisting in the environment and food chain is too small to satisfy the requirement that there be a causal connection between the conduct that was taken under federal authority and Plaintiffs' claims.

*Id.* at *9. Here, Defendants' sales of MilSpec AFFF to the government, or at the federal government's direction, were not a cause of Ridgewood's claimed injuries—not because they are insubstantial in volume, but because those products are simply not the ones that harmed Ridgewood—which in any case has disclaimed any such injury in this litigation.

The conduct that led to Ridgewood's injuries has no "'connection' or 'association'" with conduct under federal direction, *see Def. Ass'n of Philadelphia*, 790 F.3d at 471, and the conduct Defendants *do* purport to have been done under federal subjection and control—providing MilSpec AFFF to Teterboro—is not and cannot be a cause of Plaintiff's injuries. Defendants' factual assertions are not entitled to a presumption of truth where, as here, they not only misconstrue the allegations in the complaint, but are also rebutted by clear evidence that "directly undermine[s] one of the four elements of Section 1442 that must be present to confer jurisdiction . . . ." *Papp*, 842 F.3d at 811, n. 4; *see also Davis v. Wells Fargo*, 824 F.3d 333 (3d Cir. 2016) at 346. Defendants cannot satisfy the causal connection element, and because Ridgewood's injures do not arise out of federally-regulated MilSpec AFFF use, they do not share the core issue of the MDL, and the case should be remanded.

4. *Defendants Do Not Have a Colorable Federal Contractor Defense.*

Ridgewood will also prevail on its remand motion because Defendant do not "possess a colorable federal defense." *Papp*, 842 F.3d at 810. Defendants assert a federal contractor defense, requiring: "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Papp*,

842 F.3d at 814 (quoting *Boyle v. United Techs. Corp.*, 487 U.S. 500, 512 (1988)). When a defendant removes under 28 U.S.C. § 1442 on the basis of a purported government contractor defense, "the causal nexus analysis is essentially the same as that associated with the colorable defense requirement." *Hagen v. Benjamin Foster Co.*, 739 F. Supp. 2d 770, 785 (E.D. Pa. 2010) (punctuation omitted); *Vedros v. Northrop Grumman Shipbuilding, Inc.*, No. CIV.A. 2:11-67281-ER, 2012 WL 3155180, at *8 (E.D. Pa. Aug. 2, 2012) (same).

The colorable federal defense analysis here indeed collapses into the causal nexus analysis, and fails for the same reason: Defendants argue that they have a federal contractor defense based on the design, manufacture, and sale of MilSpec AFFF to federal entities or at federal direction, but Ridgewood asserts specifically that it is not injured by federally-mandated MilSpec AFFF. This distinction undermines each element of their federal contractor defense under *Boyle*. As to the first element, Defendants assert that "Naval Sea Systems Command approved reasonably precise specifications, governing AFFF formulation, performance, testing, storage, inspection, packaging, and labeling," citing the MilSpec requirements. Ex. B ¶ 35. They then aver that Defendants' Tyco and Chemguard's products "appeared on the DOD Qualified Products Listing, which could only have occurred if Naval Sea Systems Command had first determined that they conformed to the MilSpec." *Id.* And finally, they assert that "the government was adequately informed regarding alleged product related 'dangers' . . . to exercise its discretionary authority in specifying and procuring MilSpec AFFF." *Id.* at ¶ 36. Each of these allegations turns on the federal government's purchase and use of MilSpec AFFF, which are not the subject of this litigation and not a cause of Ridgewood's injuries.

The *Ayo* decision is again inapposite, precisely because this case does not concern federally-mandated MilSpec AFFF. The court did not consider—and the decision says nothing

16

about—sales of PFOA or PFOS products to purchasers other than the federal government, which are the only sector of PFOA and PFOS releasors at issue in this case. *See generally Ayo*, 2018 WL 4781145. Defendants do not have a colorable government contractor defense based on such sales. *See Bailey v. Monsanto Co.*, 176 F. Supp. 3d 853, 870 (E.D. Mo. 2016) (finding the defendant had not presented colorable government contractor defense based on its manufacture and sale of PCBs, because "though the government required the use of PCBs in certain products during the relevant time period, [. . .] Defendants sold the PCBs, by and large…not to the government itself").

Ridgewood does not concede the accuracy of Defendants' allegations concerning the merits of a speculative government contractor defense, especially the assertion that they adequately warned the United States of the environmental and human health risks from PFOA- and PFOS-laden AFFF.[7] But those facts, even if true, are a red herring. They do not establish a colorable defense here because they all concern MilSpec AFFF provided under a federal contract, which did not injure Ridgewood. Defendants cannot meet this element of § 1442, and removal was improper.

**B.    Because the Action Does Not Involve Federally-Regulated Use of MilSpec AFFF — the Principal Issue in the MDL — Transfer Is Improper.**

Even assuming the existence of federal subject matter jurisdiction, the *Ridgewood* Action concerns PFAS products and modes of contamination categorically different from the focus of the MDL, and transfer is thus inappropriate. Centralizing cases in an MDL aims to ensure efficient resolution of common pretrial issues in inter-district litigation. But the mere existence of a common

---

[7] Ridgewood's Complaint alleges, to the contrary, that Defendants knew of the environmental and health dangers of PFOA and PFOS for decades and failed to warn consumers or the public. *See* Ex. A ¶¶42–63. For that reason and others, Ridgewood vigorously disputes Defendants' reliance on the government contractor defense. Ridgewood acknowledges the *Ayo* court found that for purpose of removal only, the defendants presented evidence supporting a colorable defense based on a relationship between them and the federal government regarding the purchase of MilSpec AFFF, but the court expressly reserved any judgment on the defense's ultimate merits. *See, e.g.*, 2018 WL 4781145 at *10–11.

question of fact does not on its own warrant transfer of an action to an MDL. *See Creative Home Accents, LLC v. Fifth Third Bancrop (In re Checkin Account Overdraft Litig.)*, 818 F. Supp. 2d 1373, 1374 (J.P.M.L. 2011) (granting motions to vacate a CTO, declining transfer of cases where it would not "promote just and efficient conduct of the litigation"). Further, where individual facts of a particular case will predominate or are broader than supposedly common facts, transfer to an MDL is likewise not appropriate. *See In re Credit Union Checking Account Overdraft Litig.*, 158 F. Supp. 3d 1363, 1365 (J.P.M.L. 2016) (finding manageability issues and declining to centralize cases where specific questions would be unique to a certain case); *see also In re Abbot Laboratories, Inc.,* 763 F. Supp. 2d 1376, 1376-77 (J.P.M.L. 2011) (denying centralization where shared factual questions did not predominate over facts of individual cases).

The AFFF MDL was created by the Panel upon the finding that "all the AFFF actions involve the *same* mode of groundwater contamination caused the by the *same* product." Ex. D at p. 4 (emphasis added). The Panel based this finding on representations that the United States military was involved in the development of the original AFFF formula, and products were subsequently manufactured in compliance with that MilSpec formula. *See id.* at p.4, n. 9. Thus, *MilSpec AFFF is the focus of the MDL.*

But that is not true of the Ridgewood Action.  *See generally* Exs. A (Complaint), C. (Motion to Remand).  Federally-regulated MilSpec AFFF is not the product at issue in *Ridgewood*, and the mode of contamination does not concern federal directives to use MilSpec AFFF in the manner prescribed by the Defendants, i.e. spraying it directly on the ground during actual or simulated firefighting exercises at federally-regulated facilities. In fact, Ridgewood has *expressly disclaimed* injury from such MilSpec AFFF use. *See supra* at Preliminary Statement; *see also* Ex. A ¶¶ 68-69. Because Ridgewood's injuries do not concern "the same mode" or "the same product"

as the MDL, the Ridgewood action does not belong in this MDL. This lack of commonality alone warrants vacating the CTO-10 as to the Ridgewood Action.

## C.    Ridgewood's Claims Focus Overwhelmingly on Contamination from Non-AFFF Release Sites.

Vacating the CTO is also proper as to the *Ridgewood* Action because Ridgewood's claims concern facts that are specific to the contamination in its local water supplies and do *not* focus on AFFF sources. The Panel has already denied centralization of nine cases for the same reason — that those cases involve PFAS discharges separate and apart from AFFF.  *See* Ex. D (Transfer Order) at p. 6.  The Panel specifically declined to "expand" the MDL to include all PFAS contamination sources.  *See* Ex. D. at p. 1, n. 2. Relevant here, the Panel deemed the nine cases sufficiently dissimilar to the MilSpec AFFF cases, referring to these nine as "non-AFFF cases."

The *Ridgewood* Action most closely resembles the non-AFFF cases. Specifically, Ridgewood's injuries predominantly arise from PFOS and PFOA contamination from diffuse source points that are non-AFFF sources. *See, e.g.*, Ex. A ¶¶ 64–67, 71. For example, these sources are *industrial and manufacturing facilities and businesses*, locations where PFAS-contaminated water is used for irrigation, and sites where consumer *products are disposed*. *Id.* at ¶ 71. These types of discharge and contamination sources follow the distinction the Panel has drawn between AFFF and non-AFFF cases, with the latter involving "discharges directly into the Tennessee River by various *industrial* concerns in Decatur, Alabama; contamination originating from a shoe *manufacturer's industrial waste*; and airborne PFAS discharges from *factories* in Hoosick Falls, New York." Ex. D (Transfer Order) at p. 6 (emphasis added).

In the same vein, Ridgewood makes clear in its Complaint that its allegations of PFOA and PFOS contamination are much broader than the manufacture and use of AFFF. In particular, Ridgewood alleges that its interconnected water systems are contaminated through many industrial

processes and products, including but not limited to Teflon and other fluoropolymers, Scotchgard, medical devices, carpet coatings, architectural resins, waterproof fabrics, cooking utensils, industrial de-misters, welding equipment, coated fiberglass, wax removers, floor polish, defoamers, wetting agents, and many others. *See* Ex. A ¶¶ 8, 23, 28. Ridgewood additionally alleges the PFOA and PFOS contaminants enter the environment at every stage of their manufacture, use, and disposal. *Id.* at ¶ 28; *see also* Figures 1 and 2, *supra* at p. 5. These sources of contamination will present individual issues in discovery not present in the MDL.

Finally, transferring the *Ridgewood* Action would contravene the Panel's specific intention to limit the modes of contamination at issue in the AFFF MDL as to prevent the "unwieldy" proceedings the Panel desires to avoid.  *See* Ex. D

 (Transfer Order) at p. 1, n. 2. As such, Ridgewood's unique factual issues and emphasis on non-AFFF-based contamination warrants vacating CTO-10 as to the *Ridgewood* Action.

## CONCLUSION

Because the Action lacks a basis for federal jurisdiction, lacks the principal common issue in the MDL, and because the Action entails factual issues largely outside of the Panel's intended scope, transfer to the MDL is inappropriate.  On these bases, Ridgewood respectfully requests the Panel vacate CTO-10 with respect to the *Ridgewood* Action.[8]

Dated: May 8, 2019                                  **SHER EDLING LLP**


                                                    */s/ Matthew K. Edling*
                                                    Matthew K. Edling
                                                    100 Montgomery St., Suite 1410
                                                    San Francisco, CA 94104
                                                    Tel: (628) 231-2500

---

[8] Alternatively, to the extent a decision on Ridgewood's remand motion has not already occurred, Ridgewood requests the Panel stay a decision on this Motion until the New Jersey District Court rules on Ridgewood's Motion to Remand.

Fax: (628) 231-2929
matt@sheredling.com

Matthew S. Rogers Esq.
LAW OFFICES OF MATTHEW S. ROGERS,
ESQ., LLC
123 Prospect Street
Ridgewood, New Jersey 07450
Tel: (201) 854-3700
Fax: (201) 857-3699
msr@mrogerslaw.com

*Attorneys for Plaintiff Ridgewood Water*