# EXHIBIT C-1

Matthew S. Rogers
**LAW OFFICES OF MATTHEW S. ROGERS, L.L.C.**
123 Prospect Street
Ridgewood, NJ 07451
Tel: (201) 857-3700
Facsimile: (201) 857-3699
msr@mrogerslaw.com

Victor M. Sher (pending admission pro hac vice)
vic@sheredling.com
Matthew K. Edling (pending admission pro hac vice)
matt@sheredling.com
Katie H. Jones (pending admission pro hac vice)
katie@sheredling.com
Timothy R. Sloane (pending admission pro hac vice)
tim@sheredling.com
**SHER EDLING LLP**
100 Montgomery St., Suite 1410
San Francisco, CA 94104
Tel: (628) 231-2500
Fax: (628) 231-2929

*Attorneys for Plaintiff Ridgewood Water*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| RIDGEWOOD WATER,<br><br>Plaintiff,<br><br>-against-<br><br>3M COMPANY, E.I. DUPONT DE NEMOURS & COMPANY, THE CHEMOURS COMPANY, HONEYWELL INTERNATIONAL INC., TYCO FIRE PRODUCTS LP, CHEMGUARD, INC., BUCKEYE FIRE EQUIPMENT COMPANY, NATIONAL FOAM, INC., AND DOES 1-50, INCLUSIVE,<br><br>Defendants. | Case No. 19-cv-09651-JMV-JAD<br><br><br>DECLARATION OF DAVID TERRY |

I, David Terry, pursuant to the provisions of 28 U.S.C. § 1746, declare under penalty of perjury, that the statements contained herein are true and correct.

## I.    BACKGROUND

1.    I am Senior Vice President and Director of Operations for Water and Environment at WSP USA ("WSP"), a groundwater and environmental consulting firm. Prior to my current role, I was the president of Leggette, Brashears & Graham, Inc. ("LBG"), a groundwater and environmental consulting firm, which was acquired by WSP in 2017. I have been employed by WSP/LBG for 30 years. I make this declaration based on personal knowledge. If called to testify to the matters below, I could and would do so competently.

2.    My educational background is in geology, and I hold a Masters degree in Geological Sciences. I have been a practicing hydrogeologist for 32 years, the past 30 of which have been at LBG/WSP. I am a licensed Geologist and a New Jersey Licensed Site Remediation Professional. I am currently the Director of Operations at WSP, where I perform consulting work and oversee the work of 450 other hydrogeologists and engineers.

3.    My work has involved and involves the investigation of the impacts of contamination on public water supplies. I am an expert in the field of contaminant fate and transport via groundwater, surface water, and municipal water supply systems, including (in general), how water flows from the surface to groundwater, and then in groundwater away from the source; understanding how various compounds are affected by the characteristics of the subsurface in their fate and transport (e.g., degradation, adsorption, absorption, and other aspects of the movement of water and contaminants); water chemistry; and the composition and degradation of subsurface materials to form other compounds.

4.     I have specific experience in understanding and assessing the sources and impacts on public water supplies and public water supply wells of perfluorooctanoic acid ("PFOA") and perfluorooctanoate sulfonic acid ("PFOS") present in source water, and have investigated and assessed these and similar issues for public water-supply systems.

5.     Most of my career has focused on evaluating groundwater issues in northern New Jersey, with particular emphasis on the hydrogeology of the Brunswick Aquifer system. This work has included evaluations of the capacity and sustainable development of groundwater sources, and the fate and transport of various man-made contaminants impacting water quality in the aquifer. I have provided assessments of water supply wells impacted by volatile organic compounds, gasoline, perchlorate, dioxane, chromium, road salt and microbiologic contaminants, and assisted water systems in identifying sources and remedial approaches for such contamination.

6.     Throughout my career, I have worked with numerous municipal and public drinking water systems in areas including source development, treatment design, regulatory compliance, water distribution assessment, wellhead protection and contaminant control. I have served as the principal hydrogeologist for Ridgewood Water for more than 25 years.

7.     I have reviewed the Defendant's "Notice of Removal" and am familiar with the factual allegations contained therein. It is my opinion based on my training, experience, and review of documents, that Defendants' Notice of Removal presents false and/or misleading statements of hydrogeological facts.

## II.     PFOA AND PFOS FATE AND TRANSPORT CHARACTERISTICS

8.     PFOA and PFOS are manmade chemicals used in the manufacture of fluoropolymers, water- and grease-resistant coatings, aqueous film forming foams ("AFFF") and other industrial and consumer products.

2

9. Relevant here, PFOA and PFOS can be released to the environment when AFFF is sprayed onto the ground during firefighting or fire training activities. PFOA and PFOS associated with AFFF that is sprayed into the environment are known to enter groundwater aquifers.

10. Perfluoroalkyl substances (PFAS) are a large group of compounds (> 6,000) that include PFOA and PFOS. These two compounds are among the most stable known and do not degrade or otherwise transform appreciably under ambient environmental conditions. As such they are highly persistent in the environment which allows for widespread transport in surface and groundwater. PFOA and PFOS have high solubility in water (parts per million range) compared to their respective health-based action levels (parts per trillion range). They also have only low-moderate affinity to be adsorbed on soil grains at the concentrations of organic material found in water supply aquifers and have negligible vapor pressure.[1] Taken together, these factors (persistence, high solubility, limited sorption, negligible volatility) mean that PFOA and PFOS will move rapidly within groundwater and continue to migrate for decades.

## III. RELEVANT GEOGRAPHY AND INFRASTRUCTURE

11. Ridgewood Water's service area and well fields (collectively, "Ridgewood") are located in central Bergen County, New Jersey.

12. Ridgewood is situated approximately six miles west of the Oradell Reservoir, which is also in Bergen County. Ridgewood obtains water as needed from an interconnection with Suez New Jersey, whose primary source is the Oradell Reservoir.

13. The Hackensack River flows generally flows from north to south. Relevant here, the Hackensack River flows from Oradell Reservoir into Newark Bay. Teterboro Airport is

---

[1] U.S. EPA, *Drinking Water Health Advisory for Perfluorooctanoic Acid (PFOA)*, EPA 822-R-16-005 (May 2016); U.S. EPA, *Drinking Water Health Advisory for Perfluorooctane Sulfonate (PFOS)*, EPA 822-R-16-004 (May 2016).

3

adjacent to Berry's Creek, a tributary that joins the Hackensack River more than 13 miles downstream from the Oradell Reservoir. Although the Hackensack River is tidal, its head of tide (i.e. the farthest point upstream where a river is affected by tidal fluctuations) is located south of the Oradell Reservoir dam.

14.     Teterboro Airport is located approximately eight miles south-southeast of Ridgewood and approximately seven miles south of Oradell Reservoir, in the boroughs of Teterboro, Moonachie, and Hasbrouck Heights.

15.     Figure 1 is a map indicating the relative locations of each of the aforementioned geographical features, which are all located above the Brunswick Aquifer system.

## IV.     THERE IS NO SUBSURFACE HYDRAULIC CONNECTION CAUSING PFOA AND PFOS TO FLOW FROM TETERBORO AIRPORT TO ORADELL RESERVOIR OR DIRECTLY TO RIDGEWOOD.

16.     Groundwater contaminants that enter subsurface aquifers generally move with the prevailing groundwater flow direction ("gradient"[2]). For a variety of reasons, different contaminants may move faster or slower; some may move greater or smaller distances; some may breakdown (biodegrade) to a greater or lesser extent. But they cannot move any significant distance against the direction of flow; it is physically impossible. This is true of PFOA and PFOS when dissolved in groundwater.

17.     The prevailing groundwater gradient in the vicinity of Ridgewood, Oradell Reservoir, and Teterboro Airport parallels the prevailing surface water drainage system and the bedrock fracture system, both of which direct flows from north to south.[3] This means that

---

[2] When the word "gradient" is used in this declaration, it refers to groundwater flow direction. The term "upgradient" means against the direction of groundwater flow, and "downgradient" means with the direction of groundwater flow.

[3] Groundwater flow and groundwater-stream interaction in fractured and dipping sedimentary rocks: Insights from numerical models, Water Resources Research, Vol. 43, W01409, DOI:10.1029/2006WR004864, 2007

groundwater in the subsurface generally flows *away* from Oradell Reservoir and Ridgewood; and toward Teterboro Airport.

18.    In their Notice of Removal, Defendants state that "the flow of groundwater in [the relevant] area of New Jersey is generally in the direction running from the airport to the reservoir[.]" Notice of Removal ¶ 22. This is incorrect. Groundwater in the subsurface below Teterboro Airport does not flow toward Oradell Reservoir. Nor does groundwater below Teterboro Airport flow toward Ridgewood.

19.    Contaminants including PFOA and PFOS released to groundwater at Teterboro Airport remain within unconsolidated deposits, and flow east, west, and south, toward Berry's Creek, the Hackensack River, and ultimately to Newark Bay—all away from Oradell Reservoir.

20.    For the same reason, PFOA and PFOS released to groundwater at Teterboro Airport flow toward the Berry's Creek, the Hackensack River, and Newark Bay (to the south), and away from Ridgewood (to the north-northwest).

21.    As such, groundwater transmission of PFOA and PFOS to Ridgewood either directly or via Oradell Reservoir is not a viable mechanism to account for the contamination in Ridgewood's wells.

## V.    THERE IS NO HYDRAULIC CONNECTION BETWEEN TETERBORO AIRPORT AND RIDGEWOOD VIA ANY WATER REDISTRIBUTION SYSTEM, INCLUDING VIA ORADELL AQUEDUCT.

### a.    The Oradell Reservoir Does Not Receive Groundwater from Areas Impacted by Teterboro Airport.

22.    Groundwater in the vicinity of Teterboro Airport is impacted by salinity intrusion and historical pollution, and is unsuitable for use as drinking water.[4] Contaminants released to the

---

[4] U.S. Geological Survey, *Appraisal of Water Resources in the Hackensack River Basin, New Jersey* at 37 (1976).

subsurface at Teterboro Airport flow toward Berry's Creek and its tributaries, which drain to the south, not north. Neither Suez New Jersey, nor any other contributory water system, operates drinking water productions wells in the vicinity of, or in areas influenced by, contamination from Teterboro Airport.

23.     Figure 2 shows the locations and capture zones of existing wells near Teterboro Airport. Those wells that are used for public drinking water supply[5] are located northwest and *upgradient* of Teterboro Airport. As indicated by the wellhead protection areas ("WHPA") for each well depicted on the map (which generally approximate each well's capture zone), these are outside the influence of contaminant discharges from Teterboro Airport. While other wells are located nearer to Teterboro Airport, none of these wells[6] is used for public drinking water supply such that they could contribute water to Ridgewood's system.

24.     For the foregoing reasons, there is no possibility that PFOA and PFOS in Oradell Reservoir originated from groundwater extraction at or near Teterboro Airport.

   **b.     Suez New Jersey's Surface Water Intakes Do Not Contribute PFOA or PFOS from Teterboro Airport to Oradell Reservoir or Ridgewood.**

25.     Suez New Jersey operates surface water intakes (i.e. infrastructure that removes water from a stream and diverts into a public water supply system) on the Hackensack River. These surface water intakes are located within Oradell Reservoir and on the adjacent Hirschfield Brook.[7] Suez New Jersey does not operate surface water intakes downstream of Hirschfield Brook. Suez New Jersey's intakes are upstream of any portion of the Hackensack River that could be affected by PFOA or PFOS emanating from Teterboro Airport. PFOA and PFOS emanating from Teterboro

---

[5] Identified in Figure 2 by the wellhead protection areas for Public Supply Wells.
[6] Identified in figure 2 by the WHPAs for Non-Community wells, which are wells that are not connected to any water redistribution network.
[7] United Water NJDEP Water Allocation Permit, Program Interest ID 5082X, Activity WAP9600001

Airport therefore do not enter Suez New Jersey's redistribution infrastructure via surface water intakes.

26.     Defendants state in their Notice of Removal that "Suez Water's ... surface water sources are also in the general downgradient direction of groundwater flow from Teterboro Airport." Notice of Removal ¶ 22. This is incorrect. Suez Water does not obtain surface water from any source that could be impacted by PFOA and PFOS releases from Teterboro Airport.

## VI.     THE PATHWAY FOR CONTAMINANT MIGRATION BETWEEN SAINT-GOBAIN PERFORMANCE PLASTICS AND RIDGEWOOD DOES NOT ESTABLISH SUCH A CONNECTION BETWEEN TETERBORO AIRPORT AND RIDGEWOOD.

27.     There is a plausible pathway for contaminants to migrate from the Saint-Gobain Performance Plastics ("Saint-Gobain") facility in Wayne, New Jersey to the Ridgewood Water system under certain operating conditions. The Saint-Gobain facility is a known manufacturer and user of materials such as Chemfilm® that contained PFOA and PFOS. That facility discharges industrial wastewater to the Wayne Public Works Department Water Pollution Control-Sewage Treatment Plant, which, based on my research and current understanding, does not remove PFOA or PFOS from its effluent.

28.     The Wayne Water Pollution Control-Sewage Treatment Plant discharges upstream of the Passaic Valley Water Commission's ("PVWC") Little Falls intake on the Passaic River. PVWC furnishes water from the Little Falls intake to other water providers, including the Borough of Hawthorne Water Department, which, in turn, shares an interconnection with Ridgewood Water. Ridgewood has historically imported as much as 93 million gallons of water per year from the Hawthorne interconnection. Given the known persistence and mobility of PFOA and PFOS, this interconnected system would enable PFOA and PFOS released from the Saint-Gobain facility to ultimately migrate into Ridgewood's system. Such water, and the contaminants

therein, can recharge the groundwater aquifer when used within Ridgewood's service area and eventually be captured by Ridgewood's wells.

29.     The fact that the Saint-Gobain facility and Teterboro Airport are almost equidistant from Ridgewood does not mean that contaminants are equally able to migrate from those sites to Ridgewood's wells.  Hydraulic connectivity is affected by several other factors, including, but not limited to, the composition and transmissivity of the subsurface media; the prevailing groundwater gradient; the impact of pumping on groundwater gradient; the presence of any impediments to groundwater or contaminant migration; and the presence of artificial conveyances that may alter natural groundwater flow dynamics. As explained above, many of these factors prevent PFOA or PFOS released at Teterboro Airport from migrating through the subsurface to Oradell Reservoir or Ridgewood; or from being conveyed via artificial infrastructure from Teterboro Airport to Oradell Reservoir or Ridgewood.

**VII.   CONCLUSIONS**

1.     PFOA and PFOS released at Teterboro Airport cannot have migrated through the subsurface from Teterboro Airport to Oradell Reservoir, because to do so would require them to move in groundwater against the prevailing groundwater gradient – which is physically impossible.

2.     PFOA and PFOS released at Teterboro Airport have not entered any Suez Water surface water intake.

3.     To the extent Ridgewood has obtained water from Oradell Reservoir, that water did not contain PFOA or PFOS that originated at Teterboro Airport.

8

4.      While there is a potential pathway for contaminant migration between Saint-Gobain Performance Plastics in Wayne, NJ, and Ridgewood, there is no such migration pathway between Teterboro Airport and Ridgewood.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and ability. Executed this 24th day of April, 2019, at  SADDLE RIVER,  NJ          .

_____
DAVID TERRY

# Figure 1



**FIGURE 1**

**Legend**

- Surface Water Flow Direction
- General Groundwater Flow Direction
- Teterboro Airport
- Ridgewood Water Service Area
- Municipal Boundary
- River/Waterbody

# Figure 2



Teterboro Airport

**Legend**          **FIGURE 2**

General Surface/Groundwater Flow Direction

Wellhead Protection Area Non-Community Well

Wellhead Protection Area Public Supply Well

Teterboro Airport

Ridgewood Water Service Area

Municipal Boundary

River/Waterbody

1   0.5   0   1   Miles

# EXHIBIT D

FILED
CLERK

12/7/2018 2:23 pm

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

## UNITED STATES JUDICIAL PANEL
### on
## MULTIDISTRICT LITIGATION

IN RE: AQUEOUS FILM-FORMING FOAMS
PRODUCTS LIABILITY LITIGATION                    MDL No. 2873

## TRANSFER ORDER

**Before the Panel:**[*]  There are two motions under 28 U.S.C. § 1407 to centralize pretrial proceedings in this litigation.  Defendants Tyco Fire Products, LP, and Chemguard, Inc. (collectively, Tyco) move to centralize the 75 actions listed on Schedule A in the District of Massachusetts or, alternatively, the Southern District of New York.  All of the actions on Schedule A involve allegations that aqueous film-forming foams (AFFFs, which are used to extinguish liquid fuel fires) contaminated the groundwater near certain airports and other industrial locations with perfluorooctane sulfonate (PFOS) and/or perfluorooctanoic acid (PFOA), which allegedly were contained in the AFFFs and are toxic.

Defendant 3M Company joins Tyco's motion and separately moves to include an additional nine actions in the MDL.  These actions, which are listed on Schedule B, do not involve allegations relating to AFFFs, but 3M's manufacture of per- or polyfluoroalkyl substances (PFAS, an umbrella term that includes PFOS and PFOA).  Specifically, each of these actions names 3M as a defendant and relates to (a) its sale of PFAS or other PFAS-containing products to third-parties,[1] or (b) 3M's manufacture, management, or disposal of PFAS in connection with its manufacturing facilities.[2]  The actions listed on Schedule B are referred to as the non-AFFF actions.

Together, the two Section 1407 motions encompass 84 actions pending in twelve districts.  Additionally, the Panel has been notified of sixteen related actions pending in nine districts.  Ten of these related actions appear to involve AFFF claims, while six involve non-AFFF claims.[3]

---

[*] Judges Sarah S. Vance and Ellen Segal Huvelle took no part in the decision of this matter.

[1] PFAS chemicals, and in particular PFOA and PFOS, repel oil, grease, and water.  They were widely used for many years in the manufacture of many products, including food packaging, stain repellants, furniture fabrics, and cookware.

[2] 3M also requests the MDL caption be changed to *In re: PFAS Products Liability and Environmental Liability Litigation*.  Because we deny 3M's motion to expand this MDL beyond AFFF actions, we likewise deny this request.

[3] The related actions involving AFFF claims, as well as any other related actions involving
(continued...)

The responding parties take a variety of positions with respect to centralization and the selection of the transferee district for this litigation. Tyco takes no position on 3M's motion to expand the MDL to include non-AFFF cases. The other AFFF-manufacturer defendants support Tyco's motion. Defendants United Technologies Corporation, Kidde PLC Inc., Kidde-Fenwal, Inc., and UTC Fire & Security Americas Corporation, Inc., take no position on 3M's motion. Defendants National Foam, Inc., and Buckeye Fire Equipment Company, in contrast, oppose inclusion of non-AFFF actions. All AFFF manufacturing defendants support D. Massachusetts or S.D. New York as the transferee district.[4]

Two AFFF governmental defendants (County of Suffolk and Town of East Hampton) also support or do not oppose centralization, though East Hampton suggests the Eastern District of New York as the transferee district. Plaintiffs in 64 actions and four potential tag-along actions either do not oppose or support centralization of all PFAS actions (*i.e.*, both AFFF and non-AFFF actions). Plaintiffs in six AFFF actions pending in the District of Colorado and the Eastern District of Pennsylvania (including interim lead class counsel in both districts) oppose centralization. Plaintiffs in seven non-AFFF actions, as well as defendants Wolverine World Wide, Inc., and E.I. du Pont de Nemours and Company, oppose inclusion of the non-AFFF actions in this MDL. All of the plaintiffs support the Southern District of Ohio as the transferee district if an MDL is created, while certain of the plaintiffs also propose centralization in the Northern District of Alabama, the District of Colorado, or the District of New Jersey.

Additionally, a number of parties oppose inclusion of their respective actions in any centralized proceeding. With respect to the AFFF actions, plaintiffs in two actions pending in the District of Colorado request, in the event the Panel creates an MDL, that the consolidated *Bell* class actions in that district be excluded from the MDL.[5] Plaintiff and six groups of non-manufacturer

---

[3](...continued)
similar claims, are potential tag-along actions. *See* Panel Rules 1.1(h), 7.1, and 7.2. Several parties argue against the transfer of two of these related actions (*Hardwick*, pending in the Southern District of Ohio, and *State of New York*, pending in the Northern District of New York). These arguments are premature. *See In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prods. Liab. Litig.*, 787 F. Supp. 2d 1358, 1360 (J.P.M.L. 2011) ("Because this action is a potential tag-along action, plaintiffs' arguments are premature, and we decline to grant plaintiffs' request at this time. The proper approach is for plaintiffs to present their arguments by moving to vacate if we issue an order conditionally transferring their action to the MDL. *See* Rule 7.1. Or plaintiffs may request that the transferee judge remand their action to the transferor court. *See* Rule 10.1.).

[4] National Foam alternatively suggests the Eastern District of Pennsylvania as the transferee district in its Notice of Presentation of Oral Argument.

[5] Plaintiffs in one of these actions (*Gregory Bell*) alternatively request the Panel create
(continued...)

-3-

defendants in the *City of Newburgh* action pending in the Southern District of New York ask us to exclude that action from any MDL. Several of these parties alternatively request the Panel separate and remand plaintiff's claims against the non-manufacturers to the transferor court (though one defendant opposes this). If centralized, two of the defendant groups request the Southern District of New York as the transferee district. With respect to the nine non-AFFF actions, at least one party in each action opposes its inclusion in the MDL.[6]

On the basis of the papers filed and hearing session held, we find that the AFFF actions listed on Schedule A involve common questions of fact, and that centralization will serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation. In each of these actions, plaintiffs allege that AFFF products used at airports, military bases, or certain industrial locations caused the release of PFOA or PFOS into local groundwater and contaminated drinking water supplies. With some minor variations, the same group of AFFF manufacturer defendants is named in each action. These actions thus share factual questions concerning the toxicity of PFOA and PFOS and their effects on human health; the chemical properties of these substances and their propensity to migrate in groundwater supplies; the knowledge of the AFFF manufacturers regarding the dangers of PFOA and PFOS; their warnings, if any, regarding proper use and storage of AFFFs; and to what extent, if any, defendants conspired or cooperated to conceal the dangers of PFOA and PFOS in their products. Additionally, the AFFF manufacturers likely will assert identical government contractor defenses in many of the actions. Centralization will eliminate duplicative discovery; prevent inconsistent pretrial rulings (including with respect to discovery, privilege, and *Daubert* motion practice); and conserve the resources of the parties, their counsel, and the judiciary.

Opponents of centralization focus on the factual differences among the actions. First, they contend that location-specific factual issues will predominate over the common AFFF factual issues. Were this litigation limited to only a few actions, as in *In re Monsanto PCB Water Contamination*

---

[5](...continued)
multiple MDLs to address the various categories of actions at issue in the AFFF litigation. Doing so, however, would result in unnecessary duplication with respect to common discovery. We therefore decline this alternative request.

[6] Specifically, plaintiff in the action pending in the District of Minnesota opposes inclusion in the MDL and, alternatively, suggests the Southern District of Ohio as the transferee district. Plaintiff and Defendant Wolverine alternatively requests the Panel exclude the action pending in the Western District of Michigan, as well as any other action involving Wolverine. Plaintiff and two local defendants oppose inclusion of the *Tennessee Riverkeeper* action, pending in the Northern District of Alabama, while another local defendant (Daikin America, Inc.) opposes inclusion of any of the Alabama actions. Defendants Saint-Gobain Performance Plastics Corporation and Honeywell International Inc., as well as DuPont, oppose inclusion of the actions pending in the Northern District of New York. Finally, plaintiff and Defendant Georgia-Pacific LLC oppose inclusion of a related non-AFFF action pending in the Western District of Michigan.

Case MDL No. 2873 Document 425 Filed 12/07/18 Page 20 of 26 PageID #: 2108

-4-

*Litigation*, 176 F. Supp. 3d 1379 (J.P.M.L. 2016), the presence of site-specific contamination issues would weigh heavily against centralization. But, here we are presented with 75 AFFF actions pending in eight districts, and that number is likely to grow significantly.[7] Given the large numbers of involved actions and districts, alternatives to centralization (such as informal coordination and cooperation among counsel and the courts) are impracticable. In similar circumstances, we have centralized groundwater contamination cases despite the presence of multiple contamination sites. *See In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, MDL No. 1358, 2000 U.S. Dist. LEXIS 14901 (J.P.M.L. Oct. 10, 2000). The efficiencies to be gained through centralized treatment of common factual questions in such a large litigation are considerable.[8]

Opponents of centralization also argue that the causes of action and parties in the AFFF actions differ so significantly that any efficiencies from centralization will be offset by delay. These actions include personal injury cases brought by individuals who allegedly drank contaminated groundwater, class actions seeking to represent individuals who live near sites where AFFF was used and assert claims for medical monitoring and property damage, and cases brought by water authorities and other governmental entities seeking costs for environmental remediation or upgrades to water treatment systems. Even so, all the AFFF actions involve the same mode of groundwater contamination caused by the same product.[9] Therefore, these actions will involve significant and overlapping discovery of the AFFF manufacturers and their products. To the extent the actions entail unique factual or legal issues, the transferee court has the discretion to address those issues through

---

[7] The 44 actions pending in the District of Colorado, for instance, encompass several *thousand* plaintiffs. Additionally, we centralized another litigation involving allegations of PFOA contamination of groundwater in *In re E.I. du Pont de Nemours and Company C-8 Personal Injury Litigation*, 939 F. Supp. 2d 1374 (J.P.M.L. 2013). The C-8 Litigation involved only one contamination site, yet grew to over 3,000 individual actions at its height.

[8] Indeed, the C-8 Litigation, which was much discussed by the parties in their papers and at oral argument, involved *fewer* common factual questions to be resolved by the transferor court because questions of general causation with respect to PFOA had been resolved through a prior state court class settlement between DuPont and plaintiffs. In contrast, whether plaintiffs asserting personal injury here can show there is scientifically reliable evidence of a causal connection between AFFF products allegedly discharged into the environment and harm to plaintiffs (*i.e.*, whether PFOS or PFOA can, as a general matter, cause human illness) remains to be litigated.

[9] According to the parties, the original AFFF formulation was developed by the U.S. military in the 1960s, and all subsequent AFFF products were manufactured in compliance with a common military specification. *See* Mil-F-24385F (1992). Thus, while there may be some differences between AFFF products manufactured by different defendants, these differences are unlikely to significantly complicate the pretrial management of this litigation.

the use of appropriate pretrial devices, such as separate tracks for discovery and motion practice.[10] And, should the transferee court determine that continued inclusion of certain actions or categories of actions in the MDL no longer is appropriate, the transferee court may recommend Section 1407 remand of those actions in advance of other actions. *See In re McCormick & Co., Inc., Pepper Prods. Mktg. & Sales Practices Litig.*, 148 F. Supp. 3d 1364, 1366 (J.P.M.L. 2015).

We will not exclude any of the AFFF actions from the MDL. The Colorado plaintiffs argue that the consolidated *Bell* class actions in the District of Colorado are too advanced to warrant transfer. While those actions are the most procedurally advanced AFFF actions, the only discovery completed to date pertains to class certification.[11] Significant common discovery and pretrial motion practice pertaining to liability and general causation remain, and will benefit from inclusion in the centralized proceedings.

In contrast to *Bell*, the *City of Newburgh* action in the Southern District of New York was only recently filed. The parties opposing its inclusion in the MDL—both plaintiff and numerous non-manufacturing defendants, including the United States and the State of New York—argue that *City of Newburgh* involves unique environmental claims against non-manufacturer plaintiffs. *City of Newburgh*, though, also involves negligence and strict liability claims against the AFFF manufacturer defendants that are substantially similar to those in the other AFFF actions. To the extent the City seeks unique or time-sensitive injunctive relief pertaining to its water supplies, the City can and should raise such concerns with the transferee court. Furthermore, six other actions (three on Tyco's motion and three potential tag-alongs) involve the same allegations regarding contamination of the City's water supply through use of AFFFs at New York Stewart International Airport. Excluding *City of Newburgh* thus would result in a duplication of efforts.[12]

We agree, however, that the non-AFFF actions listed on Schedule B should not be included

---

[10] Two water authority plaintiffs have indicated their intent to ask the transferee court to create separate tracks for the water authority plaintiffs. We take no position on whether separate tracking is warranted, but leave this decision to the discretion of the transferee court.

[11] The Colorado court held a class certification hearing on November 30, 2018, but declined to rule on plaintiffs' motion prior to this Panel's decision on centralization. The court also indicated that a further hearing and additional expert testimony would be necessary before a decision on plaintiffs' certification motion can be rendered.

[12] We also deny certain parties' alternative request to separate and remand the claim against the non-manufacturer defendants to the Southern District of New York. These claims appear inextricably linked to the claims against the manufacturer defendants—for example, Defendant SWF Airport Acquisition, Inc., argues that such separation and remand will hinder its ability to assert cross-claims against the manufacturer defendants. If the parties continue to believe that separation and remand of these claims is appropriate, they may request the transferee court issue a suggestion of remand to that effect.

-6-

in this MDL. These nine actions are quite different from the AFFF actions and, indeed, from each other. They include discharges directly into the Tennessee River by various industrial concerns in Decatur, Alabama; contamination originating from a shoe manufacturer's industrial waste; and airborne PFAS discharges from factories in Hoosick Falls, New York. These actions thus are different in kind from the AFFF actions and involve more varied defendants. Moreover, 3M's proposed definition of this MDL's scope is unworkable—in the Northern District of New York, for example, there are at least 21 additional related actions involving the Hoosick Falls contamination that do not name 3M, only Saint-Gobain and Honeywell. While a non-AFFF MDL would allow for common discovery and motion practice with respect to 3M—the main producer of PFOA and PFOS—it also would include far more site-specific issues, different modes of PFAS contamination, and different PFAS chemicals (whereas the AFFF actions are limited to PFOA and PFOS contamination). Such an MDL could quickly become unwieldy. As there are relatively few non-AFFF actions, which are being managed effectively in their current districts, expansion of this MDL to include non-AFFF actions is not warranted.

Even excluding the non-AFFF actions, this MDL undoubtedly will be a complex litigation from a judicial management perspective. With this in mind, we select the District of South Carolina as the appropriate transferee district for this litigation. This district is not burdened by many MDLs and has the capacity and resources to successfully guide this litigation. More importantly, the Honorable Richard M. Gergel, who sits in this district, is an experienced transferee judge who can prudently steer the litigation. Though a related action is not currently pending in the District of South Carolina, that is not a bar to centralization in a particular district. *See In re Bard IVC Filters Prods. Liab. Litig.*, 122 F. Supp. 3d 1375, 1376-77 (J.P.M.L. 2015) (centralizing fifteen actions in the District of Arizona though no constituent action was pending in that district).

IT IS THEREFORE ORDERED that the actions listed on Schedule A are transferred to the District of South Carolina and, with the consent of that court, assigned to the Honorable Richard M. Gergel for coordinated or consolidated pretrial proceedings; and

IT IS FURTHER ORDERED that transfer of the actions listed on Schedule B is denied.

PANEL ON MULTIDISTRICT LITIGATION

_____
Lewis A. Kaplan
Acting Chair

R. David Proctor        Catherine D. Perry
Karen K. Caldwell     Nathaniel M. Gorton

**IN RE: AQUEOUS FILM-FORMING FOAMS**
**PRODUCTS LIABILITY LITIGATION**                    MDL No. 2873

## SCHEDULE A

District of Colorado

BELL, ET AL. v. 3M COMPANY, ET AL., C.A. No. 1:16–02351
BELL, ET AL. v. 3M COMPANY, ET AL., C.A. No. 1:16–02352
DAVIS, ET AL. v. 3M CORPORATION, ET AL., C.A. No. 1:16–02394
ADAMS, ET AL. v. 3M COMPANY, ET AL., C.A. No. 1:18-00705
BRAUN, ET AL. v. 3M COMPANY, ET AL., C.A. No. 1:18-00742
GORDON, ET AL. v. 3M COMPANY, ET AL., C.A. No. 1:18-01065
SMITH, ET AL. v. 3M COMPANY, ET AL., C.A. No. 1:18-01070
PARKER, ET AL. v. 3M COMPANY, ET AL., C.A. No. 1:18-01090
MANN, JR., ET AL. v. 3M COMPANY, ET AL., C.A. No. 1:18-01091
BLEICHERT, ET AL. v. 3M COMPANY, ET AL., C.A. No. 1:18-01101
GUTIERRES, ET AL. v. 3M COMPANY, ET AL., C.A. No. 1:18-01140
RODERICK, ET AL. v. 3M COMPANY, ET AL., C.A. No. 1:18-01145
CHISHOLM, ET AL. v. 3M COMPANY, ET AL., C.A. No. 1:18-01152
GOKEY, ET AL. v. 3M COMPANY, ET AL., C.A. No. 1:18-01153
SMITH, ET AL. v. 3M COMPANY, ET AL., C.A. No. 1:18-01154
WOLFE, ET AL. v. 3M COMPANY, ET AL., C.A. No. 1:18-01155
THOMAS, ET AL. v. 3M COMPANY, ET AL., C.A. No. 1:18-01156
THOMPSON, ET AL. v. 3M COMPANY, ET AL., C.A. No. 1:18-01157
KAHLER, ET AL. v. 3M COMPANY, ET AL., C.A. No. 1:18-01158
BARKER, ET AL. v. 3M COMPANY, ET AL., C.A. No. 1:18-01161
HICKS, ET AL. v. 3M COMPANY, ET AL., C.A. No. 1:18-01163
BUTTS, ET AL. v. 3M COMPANY, ET AL., C.A. No. 1:18-01164
HUTCHISON, ET AL. v. 3M COMPANY, ET AL., C.A. No. 1:18-01165
INGEMANSEN, ET AL. v. 3M COMPANY, ET AL., C.A. No. 1:18-01167
RICE, ET AL. v. 3M COMPANY, ET AL., C.A. No. 1:18-01190
HARTLEY, ET AL. v. 3M COMPANY, ET AL., C.A. No. 1:18-01191
HELM, ET AL. v. 3M COMPANY, ET AL., C.A. No. 1:18-01192
STACY, ET AL. v. 3M COMPANY, ET AL., C.A. No. 1:18-01193
CROW, ET AL. v. 3M COMPANY, ET AL., C.A. No. 1:18-01196
PADILLA, ET AL. v. 3M COMPANY, ET AL., C.A. No. 1:18-01199
TAYLOR, ET AL. v. 3M COMPANY, ET AL., C.A. No. 1:18-01201
DILWOOD, ET AL. v. 3M COMPANY, ET AL., C.A. No. 1:18-01202
SHERBAN, ET AL. v. 3M COMPANY, ET AL., C.A. No. 1:18-01270
JOHNSON, ET AL. v. 3M COMPANY, ET AL., C.A. No. 1:18-01271
GUTTENBERG, ET AL. v. 3M COMPANY, ET AL., C.A. No. 1:18-01274
CASTRO, ET AL. v. 3M COMPANY, ET AL., C.A. No. 1:18-01278
OQUENDO, ET AL. v. 3M COMPANY, ET AL., C.A. No. 1:18-01281

-A2-

GARCIA, ET AL. v. 3M COMPANY, ET AL., C.A. No. 1:18-01282
MCCLOSKEY, ET AL. v. 3M COMPANY, ET AL., C.A. No. 1:18-01285
NISKERN, ET AL. v. 3M COMPANY, ET AL., C.A. No. 1:18-01288
GIBSON, ET AL. v. 3M COMPANY, ET AL., C.A. No. 1:18-01294
HALL, ET AL. v. 3M COMPANY, ET AL., C.A. No. 1:18-01298
KELLY, ET AL. v. 3M COMPANY, ET AL., C.A. No. 1:18-01301
WALKER, ET AL. v. 3M COMPANY, ET AL., C.A. No. 1:18-01302

District of Delaware

ANDERSON, ET AL. v. THE 3M COMPANY, ET AL., C.A. No. 1:18-00769

Northern District of Florida

EMERALD COAST UTILITIES AUTHORITY v. 3M COMPANY, ET AL.,
    C.A. No. 3:18-01445

District of Massachusetts

TOWN OF BARNSTABLE v. 3M COMPANY, ET AL., C.A. No. 1:16-12351
BARNSTABLE COUNTY v. 3M COMPANY, ET AL., C.A. No. 1:17-40002
CIVITARESE, ET AL. v. THE 3M COMPANY, ET AL., C.A. No. 1:18-10747
CITY OF WESTFIELD v. 3M COMPANY, ET AL., C.A. No. 3:18-30027

Eastern District of New York

GREEN, ET AL. v. THE 3M COMPANY, ET AL., C.A. No. 2:17-02566
SINGER, ET AL. v. THE 3M COMPANY, ET AL., C.A. No. 2:17-06962
SUFFOLK COUNTY WATER AUTHORITY v. THE 3M COMPANY, ET AL.,
    C.A. No. 2:17-06982
AYO, ET AL. v. THE 3M COMPANY, ET AL., C.A. No. 2:18-00373
HAMPTON BAYS WATER DISTRICT v. THE 3M COMPANY, ET AL.,
    C.A. No. 2:18-01996
SHIPMAN v. THE 3M COMPANY, ET AL., C.A. No. 2:18-02496
PY, ET AL. v. THE 3M COMPANY, ET AL., C.A. No. 2:18-03225

Southern District of New York

ADAMO, ET AL. v. THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY,
    ET AL., C.A. No. 7:17-07131
FOGARTY, ET AL. v. THE PORT AUTHORITY OF NEW YORK AND NEW
    JERSEY, ET AL., C.A. No. 7:17-07134
MILLER, ET AL. v. THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY,

-A3-

ET AL., C.A. No. 7:17-07136
CITY OF NEWBURGH v. UNITED STATES OF AMERICA, ET AL.,
    C.A. No. 7:18-07057

<u>Eastern District of Pennsylvania</u>

BATES, ET AL. v. THE 3M COMPANY, ET AL., C.A. No. 2:16-04961
GRANDE, ET AL. v. THE 3M COMPANY, ET AL., C.A. No. 2:16-05380
YOCKEY, ET AL. v. THE 3M COMPANY, ET AL., C.A. No. 2:16-05553
FEARNLEY, ET AL. v. THE 3M COMPANY, ET AL., C.A. No. 2:16-06416
MENKES, ET AL. v. 3M COMPANY, ET AL., C.A. No. 2:17-00573
ZYSK, ET AL. v. 3M COMPANY, ET AL., C.A. No. 2:18-02036
GILLEN v. THE 3M COMPANY, ET AL., C.A. No. 2:18-02037
VOELKER, ET AL. v. THE 3M COMPANY, ET AL., C.A. No. 2:18-02038
GENTLES v. THE 3M COMPANY, ET AL., C.A. No. 2:18-02039
SATURNO v. THE 3M COMPANY, ET AL., C.A. No. 2:18-02040
GRANDE v. THE 3M COMPANY, ET AL., C.A. No. 2:18-02041
BURBIDGE, ET AL. v. THE 3M COMPANY, ET AL., C.A. No. 2:18-02043
EYNON v. 3M COMPANY, ET AL., C.A. No. 2:18-03387

<u>Eastern District of Washington</u>

ACKERMAN, ET AL. v. 3M COMPANY, ET AL., C.A. No. 2:18-00117

**IN RE: AQUEOUS FILM-FORMING FOAMS
PRODUCTS LIABILITY LITIGATION**                    MDL No. 2873

## SCHEDULE B

<u>Northern District of Alabama</u>

WEST MORGAN-EAST LAWRENCE WATER AND SEWER AUTHORITY, ET AL.
    v. 3M COMPANY, ET AL., C.A. No. 5:15-01750
TENNESSEE RIVERKEEPER INC. v. 3M COMPANY, ET AL.,
    C.A. No. 5:16-01029
KING, ET AL. v. WEST MORGAN-EAST LAWRENCE WATER AND SEWER
    AUTHORITY, ET AL., C.A. No. 5:17-01833
ARNOLD v. WEST MORGAN-EAST LAWRENCE WATER AND SEWER
    AUTHORITY, ET AL., C.A. No. 5:18-01441

<u>Western District of Michigan</u>

ZIMMERMAN, ET AL. v. THE 3M COMPANY, ET AL., C.A. No. 1:17-01062

<u>District of Minnesota</u>

CITY OF LAKE ELMO v. 3M COMPANY, C.A. No. 0:16-02557

<u>Northern District of New York</u>

LUCEY v. SAINT-GOBAIN PERFORMANCE PLASTICS CORP., ET AL.,
    C.A. No. 1:17-01054
WICKENDEN, ET AL. v. SAINT-GOBAIN PERFORMANCE PLASTICS CORP.,
    ET AL., C.A. No. 1:17-01056
ANDRICK, ET AL. v. SAINT-GOBAIN PERFORMANCE PLASTICS CORP.,
    ET AL., C.A. No. 1:17-01058